893 F.2d 58
 20 Envtl. L. Rep. 20,540
 HICKORY NEIGHBORHOOD DEFENSE LEAGUE, Plaintiff-Appellant,
v.
Samuel K. SKINNER, Secretary of Transportation; Ray A.
Barnhardt; James E. Harrington; George E. Wells,
Defendants-Appellees,
National Trust for Historic Preservation, Amicus Curiae.
 No. 89-2328.
 United States Court of Appeals,
Fourth Circuit.
 Argued Oct. 5, 1989.
Decided Jan. 2, 1990.
 
 Mary V. Carrigan, Michael Smith Scofield, Charlotte, N.C., for plaintiff-appellant.
 Elizabeth Sherrill Merritt, Seattle, Wash. (David A. Doheny, Vice President & General Counsel, Andrea C. Ferster, Asst. General Counsel, Nat. Trust for Historic Preservation in the U.S., Washington, D.C., on brief), for amicus curiae.
 Jacques B. Gelin (Robert L. Klarquist, Washington, D.C., James B. Richmond, Sp. Deputy Atty. Gen., North Carolina Dept. of Justice, Raleigh, N.C., James E. Scapellato, Regional Counsel, Edward V.A. Kussy, L. Harold Aikens, Jr., Office of Chief Counsel, Federal Highway Admin., Donald A. Carr, Acting Asst. Atty. Gen., Charles R. Brewer, U.S. Atty., Clifford C. Marshall, Asst. U.S. Atty., Asheville, N.C., on brief), for defendants-appellees.
 Before SPROUSE and WILKINS, Circuit Judges, and MacKENZIE, Senior United States District Judge for the Eastern District of Virginia, sitting by designation.
 WILKINS, Circuit Judge:
 
 
 1
 Hickory Neighborhood Defense League (Hickory Neighborhood) appeals the dismissal of its action and the denial of injunctive relief by the district court. 703 F.Supp. 1208.[1] It contends that the district court erred in concluding that the defendants had complied with section 4(f) of the Department of Transportation Act of 1976, 49 U.S.C.A. Sec. 303 (West 1989), and section 18(a) of the Federal-Aid Highway Act, 23 U.S.C.A. Sec. 138 (West Supp.1989) (collectively "section 4(f)"). It further contends that the district court erred in concluding that the defendants had complied with section 102 of the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C.A. Sec. 4332 (West 1977). We affirm in part, vacate in part, and remand.
 
 I.
 
 2
 In 1975 the North Carolina Department of Transportation (NCDOT) proposed widening a portion of N.C. Highway 127 in Hickory. Part of the proposed highway project would affect the Claremont Historic District. This historic district, developed in the late 1800's, contains many examples of architectural styles of the 1870's through the mid-1900's. The streets are lined with mature trees up to one hundred years old. The district contains fourteen pivotal buildings and thirty-six buildings that contribute to the historic district. The proposed project would border five pivotal buildings, five contributing buildings, and one non-contributing building. It would destroy one contributing building and one non-contributing building and would affect the four remaining contributing buildings and three of the pivotal buildings by taking a portion of their land. It would also destroy thirty mature trees.
 
 
 3
 With Federal Highway Administration (FHWA) approval, the NCDOT hired a consulting firm to prepare environmental studies. A Draft Environmental Impact Statement (DEIS) was prepared and circulated for comment. The DEIS analyzed five alternatives:
 
 Alternative 1 --widening N.C. 127
 
 4
 Alternative 2A--one way pair--127 and N. Center Street
 
 
 5
 Alternative 2B--one way pair--127 and 1st Street N.E.
 
 Alternative 3A--Eastern Bypass
 Alternative 3B--Middle Bypass
 Alternative 4 --postponement
 Alternative 5 --no build
 
 6
 The DEIS eliminated alternatives 3A and 3B after destination studies showed that they would not relieve the flow of traffic on N.C. 127. The DEIS recommended Alternative 1, the widening proposal.
 
 
 7
 In preparing the Final Environmental Impact Statement (FEIS), it was determined that two structures affected by the project in terms of land use were eligible for inclusion in the National Register of Historic Places. Therefore, the FEIS contained two section 4(f) evaluations, both concluding that there was no feasible and prudent alternative to widening the highway and that all possible planning had been done to minimize the harm. The proposed project then remained dormant until 1986.
 
 
 8
 In 1984 the Hickory Historic Properties Commission notified the NCDOT that the Claremont Historic District was being nominated to the National Register of Historic Places. After the proposed project was reactivated in 1986, state and federal officials prepared a Preliminary Case Report to comply with section 106 of the National Historic Preservation Act, 16 U.S.C.A. Sec. 470f (West 1985). The report analyzed the alternatives and adopted measures to minimize the proposed project's impact. The North Carolina Department of Cultural Resources recommended that the agencies reevaluate the proposed project. The report was revised and highway officials entered into a Memorandum of Agreement with the State Historic Preservation Officer and the National Advisory Council on Historic Preservation setting forth specific mitigation measures which would be taken to minimize the harm to the District.
 
 
 9
 In late 1986, the NCDOT completed a reevaluation of the proposed project and concluded that no significant changes had occurred since the FEIS in 1977 which would require preparation of a supplemental environmental impact statement. The FHWA concurred. State and federal officials did prepare a new section 4(f) evaluation that specifically addressed the impact of the proposed project on the historic district. The section 4(f) evaluation again concluded that there were no feasible and prudent alternatives to the widening alternative and that all means to minimize harm had been considered. The United States Department of the Interior agreed with these conclusions. On March 23, 1987, the FHWA approved the section 4(f) evaluation. After a public hearing, the NCDOT gave design approval on June 10, 1987. On August 28, 1987, the FHWA authorized right-of-way acquisitions. This lawsuit followed.
 
 II.
 
 10
 Section 4(f) prohibits the Secretary of Transportation from approving a highway project that requires the use of a public park, recreation area, wildlife and waterfowl refuge, or land of an historic site of national, state, or local significance unless:
 
 
 11
 (1) there is no prudent and feasible alternative to using that land; and
 
 
 12
 (2) the program or project includes all possible planning to minimize harm to the park, recreation area, wildlife and waterfowl refuge, or historic site resulting from the use.
 
 
 13
 49 U.S.C.A. Sec. 303(c) (West Supp.1989). Here, the Secretary determined that the proposed widening would use section 4(f) land. He then determined that none of the alternatives to the widening were prudent and feasible. Finally, he determined that the widening project included all possible planning to minimize the harm to the section 4(f) land.
 
 
 14
 The Supreme Court addressed review of a determination by the Secretary under section 4(f) in Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). The Court noted that under section 706 of the Administrative Procedure Act, 5 U.S.C.A. Sec. 706 (West 1977), the reviewing court is "to engage in a substantial inquiry." Overton Park, 401 U.S. at 415, 91 S.Ct. at 823. The Court identified three factors for the reviewing court to consider. First, the court must determine whether the Secretary acted within the scope of his authority. Id. In making this determination, the court must find that the Secretary could have reasonably believed that there were no feasible and prudent alternatives. Id. at 416, 91 S.Ct. at 823. Second, the court must determine that the Secretary's decision was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. Id. In deciding whether the decision was arbitrary or capricious, "the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." Id. However, the reviewing court may not "substitute its judgment for that of the agency." Id. The final factor to consider is whether the Secretary followed all procedural requirements. Id. at 417, 91 S.Ct. at 824.
 
 
 15
 Hickory Neighborhood challenges the reasonableness of the Secretary's finding that there were no feasible and prudent alternatives. The Supreme Court also provided guidance in Overton Park as to the meaning of "feasible" and "prudent." An alternative is feasible unless "as a matter of sound engineering" it should not be built. Id. at 411, 91 S.Ct. at 821. Here, the Secretary does not contend that any of the alternatives to the widening project were not feasible. The more difficult issue is whether the alternatives were prudent. The Supreme Court found that Congress did not intend that costs and community disruptions were to be ignored. Id. at 412, 91 S.Ct. at 821. However, the Court noted that protection of section 4(f) land "was to be given paramount importance." Id. at 412-13, 91 S.Ct. at 821-22. Thus, section 4(f) land could not be used unless "there were truly unusual factors present in a particular case or the cost or community disruption resulting from alternative routes reached extraordinary magnitudes." Id. at 413, 91 S.Ct. at 822. The Court also noted that the Secretary could not approve the use of section 4(f) land unless the alternatives would present unique problems. Id.
 
 
 16
 Hickory Neighborhood contends that the Secretary based his determination that there were no prudent alternatives on factors that were not unique problems and that did not create costs or community disruption reaching extraordinary magnitudes. They further contend that the district court did not apply the Overton Park standard to the Secretary's decision. The defendants counter by asserting that the administrative record reveals that the Secretary did analyze each alternative under the Overton Park prudence test.
 
 
 17
 The district court correctly noted that it was required to take a "hard look" at all relevant factors in determining whether the facts supported the Secretary's decision that there were no feasible and prudent alternatives. See Coalition for Responsible Regional Development v. Coleman, 555 F.2d 398, 400 (4th Cir.1977). On this basis the district court found that the Secretary did base his decision on a consideration of the relevant factors and that the Secretary had not made a clear error of judgment. However, the administrative record does not indicate that the Secretary determined that there were unique problems or that the disruption associated with the alternatives reached extraordinary magnitudes. Additionally, the district court did not specifically find that the Secretary had complied with the requirements of Overton Park. We think that in taking a hard look at the relevant factors, the district court should have determined whether the Secretary found that the proposed alternatives were not "prudent" as defined by Overton Park. If the district court determined that the Secretary did find that the alternatives were not prudent under Overton Park, the district court should have then specifically focused on the relevant factors to determine whether they supported the Secretary's decision. Therefore, we vacate the decision of the district court that the Secretary complied with section 4(f) and remand to the district court to make findings as to whether the Secretary determined that the alternatives were not prudent in light of Overton Park and whether the facts before the Secretary supported his determination.
 
 III.
 
 18
 Hickory Neighborhood also contends that the Secretary erred as a matter of law in determining that alternatives 2A and 2B did not use section 4(f) land and, as a result, applied the wrong test. It claims that these alternatives would impact the noise level and air quality in the historic district, thus constituting a constructive use of section 4(f) land. It argues that an alternative that uses section 4(f) land is not considered under section 4(f)(1) but must be considered under section 4(f)(2) as a means of minimizing harm after the Secretary has determined that there are no feasible and prudent alternatives. According to Hickory Neighborhood, a simple balancing test is applied under section 4(f)(2). Because the impact of alternatives 2A and 2B is less than the impact from the widening of the highway, it argues that the Secretary should have chosen one of these alternatives under section 4(f).
 
 
 19
 We need not decide whether alternatives 2A and 2B were constructive uses of section 4(f) land. Assuming that they were, the Secretary still could have rejected them if they were not prudent. We agree with other circuits which have held that the Secretary does not have to accept an alternative that causes less harm to section 4(f) land. See Druid Hills Civic Ass'n v. Federal Highway Admin., 772 F.2d 700, 716 (11th Cir.1985); Louisiana Environmental Society, Inc. v. Coleman, 537 F.2d 79, 86 (5th Cir.1976) (LES II ). As the Fifth Circuit recognized, section 4(f)(2) contains an implied feasible and prudent test. LES II, 537 F.2d at 86. It is true that an alternative may not be rejected under section 4(f)(2) for reasons relevant to determining whether the alternative is prudent. Druid Hills, 772 F.2d at 716. However, an alternative that does minimize harm may still be rejected if it is imprudent. LES II, 537 F.2d at 86. Thus, we hold that if the Secretary rejects an alternative as imprudent, he need not balance the impact on section 4(f) land from that alternative against the impact from the proposed project. Here, the Secretary rejected alternatives 2A and 2B because they were imprudent. If the district court determines on remand that the Secretary complied with Overton Park in rejecting the alternatives as imprudent, no further inquiry is required.
 
 IV.
 
 20
 Hickory Neighborhood also contends that the district court erred in determining that the Secretary did not violate section 102 of the NEPA by concluding that there were no substantial changes since the FEIS which would necessitate the preparation of a supplemental environmental impact statement. Section 102(2)(C) of the NEPA requires a federal agency to prepare an environmental impact statement (EIS) when the agency recommends "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C.A. Sec. 4332(2)(C) (West 1977). Under Department of Transportation regulations, a supplemental environmental impact statement must be prepared when "(1) [c]hanges to the proposed action would result in significant environmental impacts that were not evaluated in the EIS; or (2) [n]ew information or circumstances relevant to environmental concerns and bearings on the proposed action would result in significant environmental impacts not evaluated in the EIS." 23 C.F.R. Sec. 771.130(a) (1989). Hickory Neighborhood contends that the listing of the Claremont District in the National Register of Historic Places is a significant environmental impact requiring a supplemental EIS.
 
 
 21
 The Supreme Court recently addressed the issue of review of a decision not to prepare a supplemental EIS in Marsh v. Oregon Natural Resources Council, --- U.S. ----, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989). The Court held that the determination that an EIS not be supplemented is controlled by the arbitrary and capricious standard. Id. 109 S.Ct. at 1860. The Court further held that in determining whether the decision was arbitrary and capricious, "the reviewing court 'must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.' This inquiry must be 'searching and careful,' but 'the ultimate standard of review is a narrow one.' " Id. at 1861 (quoting Overton Park, 401 U.S. at 416, 91 S.Ct. at 824).
 
 
 22
 Hickory Neighborhood argues that the original EIS did not consider the impact of the project on the historic district because the district had not been formally recognized as historic. It also claims that the district court allowed the defendants' evaluation in compliance with section 106 of the National Historic Preservation Act to substitute for a supplemental EIS. To the contrary, the district court found that the Secretary made a reasonable decision not to prepare a supplemental EIS and that the Secretary complied with section 106, thereby ensuring that proper consideration was given to the historic district.
 
 
 23
 Not every new circumstance requires a supplemental EIS. Sierra Club v. Froehlke, 816 F.2d 205, 210 (5th Cir.1987). Rather, "the new circumstance must present a seriously different picture of the environmental impact of the proposed project from what was previously envisioned." Id. (emphasis in original). From the genesis of the proposed widening project, the presence of at least two significant historic structures was known and considered. The district court found that the FEIS adequately and thoroughly considered the impact on the environment, the economy, and the history of the area. This finding is amply supported by the record. Therefore, we affirm the decision of the district court that the Secretary complied with section 102 of the NEPA.
 
 
 24
 AFFIRMED IN PART; VACATED IN PART; AND REMANDED.
 
 
 
 [1]
 By order dated November 15, 1989, Samuel K. Skinner was substituted for James Burnley